Frank W. Mahoney and Florence S. Mahoney v. Commissioner.
Mahoney v. Commissioner
Docket No. 91986.
United States Tax Court
T.C. Memo 1963-222; 1963 Tax Ct. Memo LEXIS 122; 22 T.C.M. (CCH) 1114; T.C.M. (RIA) 63222; August 21, 1963
Eugene Harpole, for the petitioners. Roger A. Pott, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax in the amount of $2,296.91 for the calendar year 1959. The issue for decision is whether petitioners are entitled to a deduction of $14,000 for a casualty loss as a result of damage to their personal residence. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in San Francisco, California, filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue at San Francisco, California. Frank W. Mahoney is an attorney-at-law. *123 Petitioners during the year 1959 had four children, three girls and a boy. On November 23, 1958, petitioners offered to buy a home to be constructed in Forest Knolls Subdivision No. 1, city and county of San Francisco, on a lot which is now known as 237 Warren Drive, and gave a deposit of $1,250 to the Franciscan Realty Company, in connection with the offer. On December 4, 1958, petitioners were notified by a salesman of Standard Building Company that their offer had been accepted and the check was cashed. Petitioners acquired a deed to the property on August 3, 1959, and occupied the house on August 10, 1959. Petitioners purchased the property of a base price of $35,950. During the period of construction petitioners paid to Standard Building Company an additional $2,884.75 for changes and additions incorporated into the house. Closing costs on the house attributable to basis were $340.70. Other costs in the total amount of $3,893.82 were incurred by petitioners after they took possession of the house, thus bringing the total cost of the house with the additional improvements to $43,069.27. A permit to build the house was issued to Standard Building Company and the house was *124 built by Sunset Building and Supply Company. Fred Gellert is a responsible officer and stockholder in Standard Building Company, Forest Knolls Development Company, Sunset Building and Supply Company and the Franciscan Realty Company. These companies are related companies. Gellert has been in the building business since 1922. The house at 237 Warren Drive was constructed on a hillside with the cut of the hill on one side of Warren Drive being used as fill on the other or lower side. There was a reservoir at the bottom of the hill below the house. It was a 2-story house with a full basement. The first floor consisted of an entry hall, kitchen, dining room, living room, den, and one bedroom; and the second floor contained four bedrooms, two baths, and a deck off one of the rear bedrooms. The living room contained a slate fireplace which was against the center wall and supported by a center girder. The builder's plans for the house had called for a brick fireplace and when the plans were altered to provide for the heavier slate fireplace, provision was made for the additional weight with oversized foundations. When petitioners moved into the house on August 10, 1959, it was in the *125 normal condition of a new house. Within 2 or 3 weeks after moving into the house on Warren Drive petitioners began to notice large cracks in certain walls, some of the floors becoming unlevel, and doors on angles so that they would close at the top but not at the bottom of the door. Petitioners called Charles Falva, maintenance foreman of Sunset Building and Supply Company and he came to inspect the house. After inspecting the house Falva checked with his superiors including Edward V. Schulhauser, an engineer and the general superintendent of Sunset Building and Supply Company, with respect to his findings and then informed petitioners that the house would have to be "jacked" in order to compensate for "shrinkage" and the "dishing" of the house towards the center. Subsequently, other difficulties developed with the house. The front door would not stay closed, the plumbing fixtures overflowed without reason, and the water pipes inside the house began to leak. As of the end of December 1959 there were cracks in most of the sheetrock walls and some had separated and opened up. The floors were off level. Some of the sheetrock walls had bowed, some of the plumbing had pulled away from walls, *126 a deck on the second floor of the house had a large crack across it, and the stairs inside from the first to the second floor were off level. In September 1959 petitioners hired an engineer, George Washington, to investigate the damage to the structure and make findings with respect thereto. Just prior to Christmas 1959, Washington advised petitioners that he did not know what the problem was but that he would proceed with his work and make a report. In March 1960 Washington did make a written report in which he expressed the opinion that the cracks and lack of levelness of the house was due primarily to shifting of the soil. Washington recommended that petitioners obtain a soils engineer to determine the exact cause of the difficulties. In Washington's opinion a part of the difficulty with the house was due to the weight of the slate fireplace on the girders. Petitioners did obtain a soils engineer, Oliver Merwin. Merwin determined that the fill under the house was adequate and met FHA specifications. Merwin did not complete his investigation by making tests of the soil underlying the fill. It would have been necessary to make a boring for such a test at the back of the house *127 and it was not possible to get power equipment to the back of the house to make such a boring. Merwin attempted to have a boring made with hand machinery and after working 4 or 5 days had made very little progress because of the rocky nature of the soil and ceased the operation because of the expense involved in proceeding with it with hand equipment. Merwin's findings were inconclusive. Merwin did not consider the house dangerous for occupancy. If there were settlement occurring under the weight of the fill, the probability was that it would continue for 2 or 3 years and then taper off to an infinitesimal amount and there would not be any more problems. If the difficulty were failure of the soil that was supporting the fill, the action would gradually increase until sometime a failure would occur. Merwin found some evidence of lateral movement of the foundations of the house and of an old landslide downslope from petitioners' house. Forest Knolls Development Company had petitioned the Planning Commission of San Francisco for a change in zoning approximately 1,000 feet below petitioner's property on Warren Drive. That property was known as Lawton Heights. Initially the properties *128 in Lawton Heights, as well as the adjacent properties in Forest Knolls were zoned "R-1" (first residential). Property at the corner of Warren Drive and Seventh Avenue was zoned "R-4" (for high-rise apartments). The Planning Commission had rezoned certain property along Warren Drive to "R-3," thus permitting apartment houses to a height of 40 feet to be built. After this action was taken, 200 feet of property along Warren Drive in the Lawton Heights section which was adjacent to the property zoned "R-3" remained zoned "R-1." It was for this reason that the Forest Knolls Development Company petitioned for a rezoning of this 200 feet to "R-3." The petition of Forest Knolls Development Company was granted at a hearing on September 10, 1959. When petitioners had first purchased their house, the builders had represented to them that the area involved in the petition granted on September 10, 1959, was zoned "R-1." Petitioners had considered the representation to be that no rezoning of this property would be made and they had opposed the petition for rezoning at the hearings on rezoning on August 20 and September 3, 1959, as well as at the hearing on September 10, 1959, when the petition *129 was granted. Many of petitioners' neighbors also opposed the rezoning petition. Immediately after the conclusion of the Planning Commission's hearing on September 10, 1959, petitioner Florence Mahoney spoke with Fred Gellert about the problems in her home. At that time Gellert offered to repurchase petitioners' home. On the weekend following the Planning Commission's hearing on September 10, 1959, petitioners placed a sign on their property which stated "For Sale, Minority Races Welcome." Some time in October 1959 petitioners placed a second sign on their property which stated, "Sagging Walls, Sagging Floors, and Cracking Walls, Engineer Wanted." A third sign was placed on the house in December 1959 and left there until January 1960. In March 1960 a sign was placed on the house which listed eight defects of the house and offered it for sale as is. When the first sign was taken down petitioners hung a string of lemons on the house and the lemons remained hanging there until they became too ripe and were then removed. There was publicity of petitioners' controversy with Forest Knolls Development Company. In September 1959 petitioners engaged Gerald J. O'Connor, an attorney, for advice *130 in connection with a complaint that had been filed by the builders with petitioner Frank W. Mahoney's employer. Later O'Connor performed services for petitioners in attempting to settle their disputes with Forest Knolls Development Company and related companies. O'Connor received a letter dated January 7, 1960, from Albert F. Skelly, a San Francisco attorney retained by Forest Knolls Development Company, which referred to telephone conversations between O'Connor and Skelly on October 6 and 7, 1959, in which Skelly had said that his client was willing to and had offered to do whatever work was needed in petitioners' home if petitioners would remove the signs from the fron thereof. The letter further stated: In addition to this, I told you that the Forest Knolls Development Company had offered to purchase the home back from the Mahoneys at the original cost so that they would suffer no financial damage whatsoever. I further told you that I was authorized to make the same offer to you. In my last conversation with you, early in December of 1959, I informed you that we could not leave this offer to purchase open indefinitely. You are hereby notified that that offer will remain in existence *131 until January 15, 1960, at which time you and your clients are hereby notified that it will be withdrawn without further notification. The letter also referred to the possibility of commencing some action to force petitioners to remove the signs. Under date of January 12, 1960, O'Connor replied to Skelly's letter of January 7, 1960, and reported that as previously indicated in his telephone conversations with Skelly, petitioners had retained an engineer to examine the premises but had not received the engineer's report and were therefore unable at the present time to determine with certainty the course that they would pursue. This letter suggested that Skelly have his clients forward either to O'Connor or petitioners a detailed list in writing of the repairs they proposed to undertake and further stated: My clients emphasize the severe inconvenience to which they have already been put in this matter as a result of the negligent construction of this home. With regard to the offer of your clients to repurchase the home at its original cost, I must point out that the Mahoneys have been subjected to considerable inconvenience and additional expenses, over and above the original *132 purchase price of the home, by virtue of these serious defects which exist in the building. In the event that it becomes necessary for them to institute legal action with regard to the same, their damages, of course, would encompass such additional items. Under date of April 4, 1960, O'Connor wrote Skelly a letter refarring to his request for a settlement figure with petitioners in which he stated as follows: The Mahoneys state they would be willing to return the property to your clients forthwith for the sum of $42,748.25. This fiugure represents the amount the Mahoneys have put into the property up to the present time. In addition to this sum, the Mahoneys demand the sum of $30,000.00 by way of damages suffered by them as a result of the actions of your clients. This sum includes increased costs the Mahoneys would be put to to purchase a similar home at the present time as well as damages for continuing and repeated defamations uttered by the agents of Standard Building Company. The Mahoneys also desire to rescind the contract of the purchase of a second home adjoining their present one, and of course, to have refunded to them their deposit thereon. Skelly's reply to O'Connor's *133 letter was dated April 13, 1960, and stated in part as follows: After you were retained by the Mahoneys and the case was referred to me, I again made the same offer to you, which to date has not been accepted. The total cost of the building to the Mahoneys was $38,978.38. Your letter states that the Mahoneys have placed a figure of $42,748.25 on the home. You are hereby notified that if the difference between the two figures represents fixtures placed in the home or wall-to-wall carpeting that could not be removed without the Mahoneys suffering a loss, my clients will pay that difference, subject to the following conditions: An itemization of the difference between the two above-mentioned figures and an agreement that such additions are now part of the building and should remain in case of resale to my clients. As far as the $30,000 demanded by your letter "by way of damages," you are informed that we deny that any such damages have occured and will pay no part of it. You are further informed that some time ago your clients took certain actions about the home and allegedly made derogatory statements concerning its construction and the Standard Building Company. At that time I was *134 consulted concerning the filing of a suit in an attempt to stop such actions and alleged statements and for damages occasioned thereby. * * * No settlement was made between Skelly and O'Connor on behalf of their respective clients, and O'Connor because of pressure of other business abandoned his negotiations with Skelly. Under date of June 5, 1960, petitioner Frank Mahoney wrote a letter to Skelly referring to a conversation with Skelly, Fred Gellert, and Bob Pauley when they inspected petitioners' home, enclosing a list of additional costs incurred by petitioners, and stating in part as follows: The loan on the premises is a conventional 25 year life insurance loan for $25,000 at 5 1/2% interest. The current interest rate for such loans is 7% which means an additional $6900 over the life of the loan. On the date we took title to the house, it was worth a minimum of $6550 more than we had paid, based on the prices Standard was charging for the same basic house, on lots without the view which we have. The additional sums which we paid you client during construction caused 237 Warren to so differ from the basic plan that it can be called a custom house. These changes consisted *135 in part of double sinks in two bathrooms, enlarging of one bathroom, forced air permeter heat, sealing of most of the slab, additional tile and an additional tub, as well as changing the fireplace from common brick to slate and painted baseboards. Reputable brokers have advised us that their office records show an increase in value in San Francisco property of from six to ten thousand since we purchased in November 1958, and of course this house would have had unlimited opportunities if it had been without its serious defects. So far we have not mentioned the Standard Oil Co. incident of which you and your client know the details. The damage caused by this act is considerable and a settlement figure of $10,000 is considered reasonable. No figure has been set in this letter upon the disparaging remarks made by Standard Building Co. employees at the model home, which remarks were not calculated to endear me to clients or improve my professional standing. Under date of August 8, 1960, petitioners and Forest Knolls Development Company entered into an agreement whereby Forest Knolls Development Company purchased from petitioners the property at 237 Warren Drive, San Francisco, California *136 for the sum of $45,360. On this same date Forest Knolls Development Company, as lessor, and petitioners, as lessees, entered into a lease agreement whereby petitioners were permitted to remain in occupancy of the property at 237 Warren Drive for a period of up to 90 days at a rental of $1 per month. Also, on August 8, 1960, petitioners and Forest Knolls Development Company and Standard Building Company, Inc., entered into an agreement entitled, "Mutual Release." This agreement provided in part as follows: WHEREAS, There have been divers dealings and transfers between Development Company and Mahoneys with reference to the purchase by the lafter from the former of that certain home commonly known and designated as 237 Warren Drive, San Francisco, California, and disputes and differences have arisen between them with relation to said purchase and said home, during which disputes and differences references were made to Standard Building; and WHEREAS, Development Company and Mahoneys have agreed to settle all the said disputes and differences by the resale of said home by Mahoneys to Development Company and by the payment of the sum of One Dollar ($1.00) by Development Company to Mahoneys *137 and the execution of mutal releases as hereinafter provided, NOW THEREFORE, This agreement is entered into by the parties hereto; and in consideration of the purchase of said home by Development Company from Mahoneys and the sum of One Dollar ($1.00) on the execution hereof, paid by Development Company to Mahoneys, receipt of which is hereby admitted, and in consideration of the execution of this mutual release, each of the parties hereby releases the other, its or his heirs, executors, administrators, successors or assigns from all sums of money, accounts, actions, claims and demands up to the date of the execution of this release. Hartford Fire Insurance Company had issued a "home owners" insurance policy to petitioners when they had occupied another residence prior to their purchase of 237 Warren Drive. This policy was endorsed as of July 31, 1959, to effect a change in coverage to include the Warren Drive property. The coverage at that time was increased from $22,500 to $25,000. At the time the insurance was increased a Form 350 which contained an exclusion against earth movement had been placed on the policy but this Form 350 endorsement provided that the earth movement exclusion *138 would not apply to the original amount of $22,500. In September 1959 petitioners orally notified an agent of the Hartford Fire Insurance Company that they made a claim under this policy. In April 1960 petitioners were informed by a representative of Hartford Fire Insurance Company that it appeared that the settlement in the building covered by the Hartford policy was not excessive and that the endorsement made on the policy on July 31, 1959, on Form 350, contained an earth movement exclusion which was self-explanatory and that it would appear that no coverage would be accorded petitioners under the policy. Petitioners pursued the matter of their insurance coverage by addressing a letter to the Insurance Commission of California and one to the home office of Hartford Fire Insurance Company, and subsequently Milton B. Mitchell, superintendent of Fire and Inland Marine Loss Department of the Hartford Fire Insurance Company, negotiated with petitioners in an attempt to settle their claim. Petitioners were notified by the Hartford Fire Insurance Company to file a written proof of loss which they did file on July 19, 1960. The negotiations between Mitchell and petitioners led to a settlement *139 of petitioners' claim under their Hartford Fire Insurance Company policy whereby petitioners were paid $3,000 and signed a release and discharge of Hartford Fire Insurance Company from all damage they might now have or which might thereafter accrue to them by reason of alleged damage by landslide, earth movement, or earth settlement. Petitioners agreed in further consideration of the payment that their insurance policy should be amended by the deletion therefrom of all insurance on the property from the hazard of landslide, earth movement, or earth settlement. A check of Hartford Fire Insurance Company in the amount of $3,000 payable to petitioners was drawn on August 24, 1960, in payment of the $3,000 provided for in the settlement. This check contained on its face the notation that it was in payment for loss under petitioners' policy "occasioned by shrinkage of new building occurring 9-25-59." After petitioners vacated the property at 237 Warren Drive, the builders made certain repairs to the property at a cost of approximately $1,200. These repairs consisted of raising the center girder, repairing cracks in the wallboard with proper taping and repainting, and replacing vinyl floors *140 in the dining room and living room which had been placed in the house by petitioners' request for changeover, with hardwood. After the center girder was raised and a shim placed beneath the columns directly supporting the girder, the stairways levelled and the floors levelled. The repairs made by the builders after petitioners vacated the premises at 237 Warren Drive were the same repairs that the builders had offered to make while petitioners still owned the property without cost to petitioners and were similar to repair work done in some of the other new homes which had been built by these builders. The extent of the shrinkage in the property at 237 Warren Drive was greater than that in the other homes which the builders repaired in a similar manner. After these repairs were made by the builders, the house at 237 Warren Drive was sold by Forest Knolls Development Company or a related company to Bodo Kaarge, and engineer, for $40,000. Kaarge purchased the house in the first part of March 1961. At the time he purchased the house he was aware that the house had been jacked up because he personally had inspected the house before purchasing it. This inspection had shown an extra plate *141 approximately five-eighths of an inch thick inserted on top of the original plate supporting the center girder. Since purchasing the property Kaarge has called on Forest Knolls Development Company or a related company to repair a crack on the top deck which had caused some leakage. Since Kaarge purchased the property the sheetrock walls have developed two hairline cracks. Kaarge is satisfied with the house at 237 Warren Drive and has purchased a second house from Forest Knolls Development Company or a related company. Petitioners on their joint income tax return for the year 1959 claimed a deduction of $14,000 as a casualty loss with the explanation that subsoil subsidence had caused damage to the property at 237 Warren Drive, and the insurance company had denied coverage for this type of earth movement. The $14,000 amount was arrived at by showing a value of the house before earth movement of $45,000 and a value of the house after subsidence of $31,000. Respondent in his notice of deficiency disallowed the claimed casualty loss deduction with the following explanation: Since a reasonable prospect for reimbursement for damage to your newly constructed residence due to soil subsidence *142 existed in 1959, it is held that you did not sustain a deductible casualty loss in 1959. The casualty loss claimed in the amount of $14,000.00 has therefore been disallowed. By amended answer filed at the trial respondent alleged that petitioners did not sustain a loss during the taxable year 1959 arising from a casualty and that damage to petitioners' new house resulted from settlement which was normal in the type of home owned by them. Opinion Respondent takes the position (1) that the damage to petitioners' home at 237 Warren Drive was not proximately caused by a casualty, (2) that there was never an actual loss to petitioners from the damage to the property at 237 Warren Drive evidenced by a closed and completed transaction as of the end of 1959, and (3) that in any event there existed at the end of 1959 claims for reimbursement with respect to any damage to petitioners' home on which there were reasonable prospects of recovery of any amount of loss from the damage to petitioners' home which might exist at the end of 1959. It is petitioners' position that respondent has the burden of proof on the issue of whether the loss resulted from a casualty or from normal settlement *143 since this issue is raised by respondent's amended answer and is not a basis for the denial of the claimed deduction assigned in the notice of deficiency. It is petitioners' position that in any event the evidence shows that the damage to their house did result from a casualty. Petitioners claim that they did sustain a loss from the claimed casualty in the amount of $14,000 and that at the end of 1959 petitioners had no reasonable prospects for recovery of any loss occasioned by the damage to their residence. The evidence shows that damage did occur to petitioners' residence from settlement of soil and also that the fair market value of the property was to some extent less after this settlement took place with its resulting damage than it was before. Respondent in fact does not deny these facts. Much of the argument in the briefs of each of the parties is devoted to whether the cause of the damage to petitioners' residence was from a casualty within the meaning of section 165 of the Internal Revenue Code of 1954, [1] and if so what amount was the difference between the value of the property before the casualty and after the casualty. We consider it unnecessary *144 to decide either of these questions since we agree with respondent that petitioners have failed to show that they sustained a loss in a closed and completed transaction which was not compensated for by insurance or otherwise. The physical damage to the property occurred in 1959 but at the end of that year there were still the reasonable prospects of repair to the property by the builders at no cost to petitioners, the repurchase of the property by the builders at an amount which would relieve petitioners of any loss, and the collection by petitioners of insurance for any loss that occurred. Where such reasonable prospects of recovery exist, no loss has been "sustained" during the taxable year by a completed and closed transaction. Commissioner v. Harwick, 184 F. 2d 835 (C.A. 5, 1950), affirming a Memorandum Opinion of this Court; Allied Furriers Corporation, 24 B.T.A. 457 (1931); Callan v. Westover, 116 F. Supp. 191, 198 (S.D.Calif., 1953), affirmed per curiam, sub nom., Riddell v. Callan, 235 F. 2d 190 (C.A. 9, 1956). Cf. Boehm v. Commissioner, 326 U.S. 287 (1945). *145 Petitioners argue that under California law they had no right of action for recovery against the seller. Petitioner Frank W. Mahoney, who is an attorney, stated this to be his legal opinion. The basis for his opinion is that he had not purchased from a contractor but from a developer and there is no warranty of quality for a house in California. It is not clear whether petitioners' argument is that there is no warranty from soil failure as distinguished from construction defects or no warranty of any kind. The stipulated facts show that petitioners offered to purchase a house "to be constructed" and that this offer was accepted. The contract is not in evidence but we certainly cannot assume that it did not provide for the quality of the construction. Certainly, petitioners' negotiations with the builders give every indication that both parties recognized the builders' obligation to remedy any structural defects. The evidence shows that repairs have been made to remedy similar though less extensive damage in other houses built by these same builders. Whether petitioners had a right of recovery from the seller for damage from earth movement is unimportant since damage from such cause *146 was covered by their insurance. Petitioners argue that they had no definite offer for an amount for the repurchase of their home at the end of 1959 and that even if they did it was an oral offer which would not have been legally enforceable. We think that the evidence is reasonably clear that as of the end of 1959 the builders stood ready to repurchase petitioners' home at the amount of petitioners' total cost of the home. We do not believe the technical question of whether this offer might have been legally enforceable in California had the builders refused to honor it is the determinative factor here. The builders recognized their obligation to petitioners to compensate for the damage to their house and whether such compensation were to be by repairs or by repurchase of the house, petitioners have not shown a closed transaction at the end of 1959 resulting in their having sustained a loss in that year. Cf. Charles D. Whitnney, 13 T.C. 897, 901 (1949). While petitioners had no commitment as of the end of 1959 from the insurance company to pay any amount for the damage to their house, the evidence shows that as of that time they had not filed a proof of loss and no *147 denial of any insurance claim had been made. They were still contending as of the end of 1959 that a payment was due. While some doubt existed whether petitioners would be compensated by the insurance company, there appeared sufficient possibility of recovery to cause the deduction for any loss not to be proper as of the end of 1959. Commissioner v. Harwick, supra, and Allied Furriers Corporation, supra.In Coastal Terminals, Inc., 25 T.C. 1053, 1057 (1956), we pointed out that in Allied Furriers Corporation, supra, and Commissioner v. Harwick, supra, the taxpayers had a contract with the insurance company which purported to offer coverage for the kind of loss that had been sustained, but that the taxpayer there involved had no insurance contract which purported to cover the type of loss sustained. In the present case, petitioners had an insurance contract which covered damage from earth movement which petitioners are here contending was the cause of the damage sustained. In this respect the facts are similar to Allied Furriers Corporation, supra, and Commissioner v. Harwick, supra. Petitioners *148 point out that "The Taxing Act does not require the taxpayer to be an incorrigible optimist." United States v. White Dental Co., 274 U.S. 398 (1927). Under the facts here present we believe that only an incorrigible pessimist would have considered as of December 31, 1959, that petitioners would not be compensated for the damage to their house. Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. Sec. 165(a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. No loss described in this paragraph shall be allowed, if at the time of the filing of the return, such loss has been claimed for estate tax purposes in the estate tax return.↩